# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BLUE RIDGE ENVIRONMENTAL** ) | |
| **DEFENSE LEAGUE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 22-cv-3134 (APM)** |
| ) | |
| **MICHAEL S. REGAN,** ) | |
| ***Administrator of the EPA,*** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are various environmental advocacy groups, who seek to compel the Environmental Protection Agency ("EPA" or "the Agency") to fulfill certain mandatory rulemaking duties updating emissions standards for hazardous waste combustors under the Clean Air Act, 42 U.S.C. § 7401 *et seq*. The EPA does not dispute that it has failed to complete the rulemaking required of it by Congress. The only contested issue is the timeline under which this court should order the Agency to issue a final rule.

Before the court are the parties' cross-motions for summary judgment. *See* Pls.' Mot. for Summ. J., ECF No. 24 [hereinafter Pls.' Summ. J. Mot.]; Def.'s Cross-Mot. for Summ. J., ECF No. 26 [hereinafter Def.'s Summ. J. Mot.]. Having considered the parties' various submissions, the court orders the EPA to complete rulemaking by December 31, 2025.

## I.     BACKGROUND

### A.     Legal and Regulatory Landscape

The Clean Air Act ("CAA") serves "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its

population." 42 U.S.C. § 7401(b)(1).  By the late 20th century, Congress was concerned with the CAA's ineffectiveness and amended it in 1990 "to strengthen and expand the [CAA] through a technology-based program." *Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004) (quoting H.R. Rep. No. 101-490, pt. 1, at 144 (1990)) (internal quotation marks and alterations omitted).  It did so in a few ways.  First, Congress included a specific list of nearly 200 hazardous air pollutants ("HAPs") for mandatory regulation by the EPA.  *See id.* at 979–80 (citing 42 U.S.C. § 7412(b)).  Second, it "established an emission standards implementation process 'based on the maximum reduction in emissions which can be achieved by application of best available control technology.'" *Id.* at 980 (quoting S. Rep. No. 101-228, at 133 (1989)).  And, third, Congress "imposed a series of deadlines by which the EPA was required to promulgate, and periodically revise, emission standards for sources that emit those pollutants." *Cmty. In-Power & Dev. Ass'n, Inc. v. Pruitt*, 304 F. Supp. 3d 212, 216 (D.D.C. 2018) (citing 42 U.S.C. § 7412(c)(1), (c)(2), (d)).

Under the 1990 CAA amendments, the EPA was required to publish an initial list of all categories of "major" and "area" sources of HAPs within one year.  42 U.S.C. § 7412(c)(1). A major source is "any stationary source or group of stationary sources located within a contiguous area and under common control that emits . . . 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." *Id.* § 7412(a)(1). A stationary source, in turn, includes "any building, structure, facility, or installation which emits or may emit any air pollutant." *Id.* § 7411(a)(3).  An area source is "any stationary source of hazardous air pollutants that is not a major source." *Id.* § 7412(a)(2).  The CAA "calls upon [the] EPA to list the 'source categories' most responsible for emissions of each HAP listed in the statute" and "promulgate regulations governing their emission of HAPs." *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 48 (D.D.C. 2006).

To regulate emissions, the Agency had to "specify the source's maximum allowable emission" of listed HAPs. *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1092 (D.C. Cir. 2020) [hereinafter *LEAN*] (citing 42 U.S.C. § 7412(d)(1)).  Congress created a two-step approach for the initial promulgation of emissions standards.  For the first step, the Agency must use technology-based standards known as "Maximum Achievable Control Technology" ("MACT").  *See Sierra Club v. EPA*, 353 F.3d at 980 (citing S. Rep. No. 101-228, at 148 (1989)).  EPA begins by establishing what are known as "MACT floors"—the minimum emissions standards set by comparison to the best-performing sources in a particular category.  *Id.*  For new sources, *i.e.,* stationary sources built after the EPA published its HAP regulations, *see* 42 U.S.C. § 7412(a)(4), the statute provides that "[t]he maximum degree of reduction in emissions that is deemed achievable . . . shall not be less stringent than the emission control that is *achieved in practice* by the best controlled similar source," *id.* § 7412(d)(3) (emphasis added).  For existing sources, *i.e.,* those stationary sources which are not considered new sources, *see id.* § 7412(a)(10), emissions standards must be at least as stringent as the average emissions limitations achieved by (1) the best-performing 12% of existing sources for which the EPA has emissions information or (2) the best-performing five sources for which the EPA has emissions information in categories that contain fewer than 30 existing sources, *id.* § 7412(d)(3)(A)–(B).  With these MACT floors set, the EPA's second step is to determine whether stricter standards are "achievable," in light of costs and other factors listed in the statute.  *Id.* § 7412(d)(2); *see also LEAN*, 955 F.3d at 1093.

Congress expected the EPA to act expeditiously in setting MACT standards.  It required the Agency to complete emissions standards for 40 source categories within two years and all remaining emissions standards by no later than November 15, 2000.  42 U.S.C. § 7412(e)(1)(A),

(E).  When a new source category is listed, the EPA must promulgate emissions standards within two years.  *Id.* § 7412(c)(5).

Congress recognized that environmental conditions and technology do not stand still, so it also required the EPA to conduct ongoing reviews of emissions standards.  Under 42 U.S.C. § 7412(d)(6) and § 7412(f)(2), the EPA must revisit its initial emissions standards within eight years of promulgation on two fronts.  First, § 7412(d)(6) requires EPA to reevaluate its current emissions standards *every* eight years to consider improvements in pollution "practices, processes, and control technologies," a process known as a "technology review."  *See* 42 U.S.C. § 7412(d)(6); *see also LEAN*, 955 F.3d at 1093 (noting that the technology review "ensures that, over time, EPA maintains source standards compliant with the law and on pace with emerging developments that create opportunities to do even better" with regards to pollution control).  Second, § 7412(f)(2) requires the Agency to revisit emissions standards one time within eight years of initial promulgation to assess whether more stringent standards are required to protect public health and prevent environmental harm, known as a "residual risk review."   42 U.S.C. § 7412(f)(2). To discharge its duties under these sections, EPA must either promulgate revised standards or publish a determination that such revisions are not necessary.  *Id.* § 7412(d)(6), (f)(2); *id.* § 7607(d)(1), (d)(5), (h); *see also Club v. McCarthy*, No. 15-cv-01165-HSG, 2016 WL 1055120, at *2 (N.D. Cal. Mar. 15, 2016).

As part of the technology review required under § 7412(d)(6), the EPA also must establish technology-based standards for listed HAPs that are emitted by the source category but that are not regulated by the existing standards under review.  *See LEAN*, 955 F.3d at 1096.  Therefore, within eight years of an initial regulation, the EPA must not only update the standards for "regulated HAPs"—those HAPs that were the subject of the initial emissions standards for each

source category—but it also must issue emissions standards for "unregulated HAPs" if they are shown to be generated by the source category. *See id.* ("There is no dispute that the Act requires EPA to have in place emission standards to control all the listed pollutants that a source category emits, and requires the Agency to revise existing standards that are underinclusive to add [additional] controls for listed but unaddressed pollutants."). Put another way, if the EPA finds during its periodic technology review that a source is emitting listed HAPs that were not included in the original rulemaking for the source category, EPA must promulgate initial emissions standards for these HAPs under the two-step MACT process.

### B.    Emissions Standards for Hazardous Waste Combustors

This case involves facilities that burn hazardous waste ("hazardous waste combustors" or "HWCs"). The HWC source category includes six sub-categories: hazardous waste incinerators; hazardous waste cement kilns; hazardous waste lightweight aggregate kilns; hazardous waste solid fuel boilers; hazardous waste liquid fuel boilers; and hazardous waste hydrochloric acid production furnaces. *See* 40 C.F.R. § 63.1200. There are at least 100 HWC sources across the country. *See* EPA, *ECHO Clean Air Tracking Tool- Emission Screener*, https://echo.epa.gov/trends/emission-screener (searching by MACT Subpart EEE—Hazardous Waste Combustors) (last visited Dec. 10, 2024). HWCs emit several HAPs, including arsenic, chlorine gas, dioxins, lead, and mercury. *See Nat'l Emission Standards for Hazardous Air Pollutants: Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors (Phase I Final Replacement Standards and Phase II)*, 70 Fed. Reg. 59,402, 59,406–08 (Oct. 12, 2005).

HWCs are major sources of HAP emissions. *Id.* at 59,402. The EPA initially promulgated standards for three types of HWCs in 1999—hazardous waste incinerators, hazardous waste burning cement kilns, and hazardous waste burning lightweight aggregate kilns. *See NESHAPS:*

*Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors,* 64 Fed. Reg. 52,828 (Sept. 30, 1999).  However, the D.C. Circuit vacated these standards as unlawful because they did not satisfy the CAA's stringent emissions requirements.  *See Cement Kiln Recycling Coal v. EPA*, 255 F.3d 855, 861–66 (D.C. Cir. 2001).  The EPA then issued new standards for these and all remaining sub-categories of hazardous waste combustors in 2005, five years after the final deadline set by the CAA.  *See Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors (Phase I Final Replacement Standards and Phase II)*, 70 Fed. Reg. at 59,404.  These standards were again challenged as unlawful, *see* Pet. for Review, Doc No. 936958-1, *Sierra Club v. EPA*, No. 05-1441 (D.C. Cir. Dec. 8, 2005), and the EPA granted partial reconsideration of the 2005 replacement standards, *NESHAP: Nat'l Emission Standards for Hazardous Air Pollutants: Standards for Hazardous Waste Combustors (Reconsideration)*, 71 Fed. Reg. 52,624 (Sept. 6, 2006).

In October 2008, the Agency once again promulgated revised standards for hazardous waste combustors.  *See NESHAP: Nat'l Emission Standards for Hazardous Air Pollutants: Standards for Hazardous Waste Combustors: Reconsideration*, 73 Fed. Reg. 64,068 (Oct. 28, 2008).  These standards, too, were challenged in the D.C. Circuit, where the EPA voluntarily agreed to remand both the 2005 and 2008 standards for further consideration.  *See* Order, Doc. No. 1201131, *Sierra Club v. EPA*, No. 05-1441 (D.C. Cir. Aug. 14, 2009).  In the over fifteen years since, the EPA has not issued new standards, and the initial 2005 and 2008 standards remain in force.  *See* Def.'s Summ. J. Mot., Mem. in Supp., ECF No. 26-1 [hereinafter Def.'s Summ. J. Mem.], at 6.  The EPA has yet to conduct the required technology and residual risk reviews under § 7412(d)(6) and (f)(2), *see supra* at 4, which were due by October 2016 at the latest.

C.    **Procedural History**

On October 14, 2022, Plaintiffs filed this suit under the CAA's citizen suit provision to compel the EPA to issue long-awaited updated emissions standards for HWCs.  *See* Pls.' Compl., ECF No. 1, ¶ 8 (citing 42 U.S.C. § 7604(a)).  Meanwhile, also in the fall of 2022, the Agency began preparing the required residual risk and technology reviews (together, "risk and technology review," or "RTR") for the hazardous waste combustor source category.  *See* Def.'s Summ. J. Mem. at 6.  This RTR is ongoing.  *See* Decl. of Penny E. Lassiter, ECF No. 36 [hereinafter Lassiter Decl. III], ¶ 4.  Plaintiffs, however, seek to hurry this process along.  To that end, they request a declaratory judgment stating that the EPA has failed to comply with its statutory obligations under § 7412(d)(6) and (f)(2), as well as injunctive relief mandating that the EPA review and revise the emissions standards applicable to hazardous waste combustors or determine that such revision is not necessary by a date certain.  Compl. at 13.  Plaintiffs also seek attorney's fees and costs.  *Id.*

All parties agree that over eight years have passed since the Agency promulgated emissions standards for hazardous waste combustors, and that the EPA has not completed the required RTR. *See* Pls.' Summ. J. Mot., Pls.' Stmt. of Material Facts, ECF No. 24; Def.'s Summ. J. Mot., Def.'s Stmt. of Material Facts, ECF No. 26-3.  Where they disagree is on the appropriate remedial schedule, which has been complicated by unforeseen hurdles in the ongoing RTR process and the passage of time since the parties submitted their motions.

*1.    The Original Timeline*

In their May 2023 opening brief, Plaintiffs proposed a remedial schedule that would require the EPA to promulgate a final rule for hazardous waste combustors under 42 U.S.C. § 7412(d)(6) and (f)(2) within 18 months of the court's order, with an interim deadline of nine months for the proposed rule.  *See* Pls.' Summ. J. Mot. at 10.  The EPA in its July 2023 opening brief proposed a

7

deadline of August 14, 2026, for a final rule, and it resisted any interim deadline given the "unusually complex and heterogenous hazardous waste combustor source category." Def.'s Summ. J. Mem. at 2. EPA supported its position with a declaration from Penny Lassiter, the Director of the Sector Policies and Programs Division in the Office of Air Quality Planning and Standards, the division within the EPA responsible for this rulemaking. *See* Def.'s Summ. J. Mot., Decl. of Penny Lassiter, ECF No. 26-2 [hereinafter Lassiter Decl. I], ¶¶ 1–3.

Lassiter identified nine phases necessary to complete the RTR rulemaking for HWCs, and provided estimates of the minimum amount of time the EPA believed each remaining phase would take. *Id.* ¶¶ 18–27. These phases are standard to the RTR process for HAP sources. *See Blue Ridge Envt. Def. League v. Pruitt*, 261 F. Supp. 3d 53, 58–59 (D.D.C. 2017); *Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 203–04 (D.D.C. 2017).

The first three phases involve information gathering, some of which the EPA had completed for the challenged RTR. In Phase I (completed as of July 2023), the EPA establishes a project team and agency work group, determines whether it needs the support of outside contractors, and identifies potential stakeholders interested in the rule development. *Id.* ¶ 19. In Phase II (completed as of July 2023), the EPA gathers background literature about the source category, establishes the inventory of facilities in the relevant source category, and compiles data regarding these facilities from permits and available performance test data. *Id.* ¶ 20. In Phase III (partially completed as of July 2023, with 11 more months estimated at that time), the Agency determines whether supplemental information is needed from the sources. *Id.* ¶ 21. For the hazardous waste combustors RTR, Lassiter declared that HWCs "vary widely in design types and waste compositions burned," resulting in an "increase [in] the amount of information and testing" the EPA needed for supplemental information collection. *Id.* Accordingly, the Agency signaled that

it would likely need to send a survey to HWC facilities, which required a minimum of four months to develop and receive responses. *Id.* ¶ 21(a). After receipt of those responses, Lassiter stated that additional emissions testing would likely be required by the facilities, which she believed would take roughly seven months. *Id.* ¶ 21(b).

After these information-gathering phases, the EPA turns to the substance of the RTR rulemaking process. In Phase IV (partially completed as of July 2023, with two more months estimated at that time), the EPA "analyzes and organizes the data collected" in the previous phases. *Id.* ¶ 22. The Agency develops a "detailed modeling file that provides required inputs" to conduct various risk analyses, including emissions information from its inventory of facilities in the source category. *Id.* It also compiles "data and information regarding processes emissions, controls, work practices, pollution prevention measures and other relevant factors (such as cost and feasibility)" to later determine whether the emissions rules should be revised pursuant to § 7412(d)(6). *Id.* In Phase V (four months estimated), the EPA performs its actual residual risk analysis and technology review. *Id.* ¶ 23. The Agency assesses the risk from chronic inhalation of, and ingestion of food contaminated with, each HAP; examines the potential for adverse environmental effects associated with certain HAPs; and determines if emissions from the source category result in disproportionate risks to various demographic groups. *Id.* ¶ 23(a)–(d). Simultaneously, the EPA evaluates the performance of new or improved control technologies and emission reduction measures and the costs associated with these new technologies, and it determines if any of the developments should be incorporated into new emissions standards. *Id.* ¶ 23(e).

The remaining phases involve getting the RTR rule out the door. Phase VI (eight months estimated) is comprised of developing and completing the proposed rule package, which involves technical analyses, drafting of the regulatory package and technical memoranda accompanying it,

briefings for and review by EPA stakeholders, and, in many instances, review by the Office of Management and Budget ("OMB").  *Id.* ¶ 24.  In Phase VII (three months estimated), the EPA publishes the proposed rule in the Federal Register and commences the public notice, hearing, and comment period.  *Id.* ¶ 25.  The CAA requires that the EPA provide an opportunity for a public hearing and that the public comment period remain open for at least 30 days after that hearing. *See* 42 U.S.C. § 7607(d)(5).  Phase VIII (two to three months estimated) involves reviewing, summarizing, and responding to comments received about the proposed rule.  *Id.* ¶ 26.  Finally, in Phase IX (seven to eight months estimated), the EPA develops the final rule package, which may include OMB review.  *Id.* ¶ 27.

Because some of these phases were completed or partially completed by July 2023, Lassiter estimated a minimum of 37 more months to complete the RTR rule for the HWC source category. *Id.* ¶ 28.  The EPA therefore requested until August 14, 2026, to promulgate its final RTR rule for HWCs.  *Id.* ¶ 16.  Plaintiffs resisted this proposed schedule, arguing that the EPA failed to demonstrate that more expeditious compliance with their statutory duties was impossible.  *See* Pls.' Combined Reply in Supp. of Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J., ECF No. 28, at 6–14.

### 2.    Later Developments

As the RTR process was ongoing, the Agency's timeline shifted based on its on-the-ground experience.  In its reply brief, the EPA stated that its review during Phase II revealed that HWC sources likely emitted *unregulated* HAPs.  *See* Def.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 31 [hereinafter Def.'s Reply], Decl. of Penny Lassiter, ECF No. 31-2 [hereinafter Lassiter Decl. II], ¶ 4.  Recall, the EPA is required by law to issue initial standards for unregulated HAPs in tandem with its technology review under § 7412(d)(6).  Def.'s Reply at 1 (citing *LEAN*, 955

F.3d at 1096–97).  As a result, the EPA determined that it needed to issue two surveys to various HWC sources requesting additional information about unregulated HAPs.  *See* Lassiter Decl. II ¶¶ 5–9.  The first survey, issued to nine entities comprising the six sub-categories of HWC sources, required recipients to provide all available emissions information for unregulated HAPs that they emit in addition to emissions information regarding regulated HAPs.  Lassiter Decl. II ¶ 6; Decl. of Penny Lassiter, ECF No. 40 [hereinafter Lassiter Decl. IV], ¶ 5.  The second survey, which was to be issued after results of the first returned, required the same nine entities to conduct operational performance testing with respect to the unregulated HAPs.  Lassiter Decl. II ¶¶ 9–10.  The EPA stated in its reply brief that both surveys would be completed by July 31, 2024, and that it could still promulgate the final rule by August 14, 2026.  Def.'s Reply at 4; Lassiter Decl. II ¶¶ 10–13.  Plaintiffs disputed that the EPA's obligation to set new limits for unregulated HAPs justified putting off its RTR until after return of the second survey.  *See* Pls.' Mot. for Surreply, ECF No. 32, Pls.' Surreply, ECF No. 32-1, at 2.[1]

Since the parties completed their initial briefing, the contours of the EPA's proposed timeline have morphed further.  On July 24, 2024, EPA proposed a *partial* rulemaking regarding the HWC source category.  *See Nat'l Emission Standards for Hazardous Air Pollutants From Hazardous Waste Combustors Malfunction and Electronic Reporting Amendments*, 89 Fed. Reg. 59,867 (July 24, 2024).  EPA says that the main purpose of this rulemaking was to institute electronic reporting provisions to provide EPA data in a readable form needed to make the rulemaking process more efficient.  Hr'g Tr., ECF No. 41, at 4.  As Plaintiffs note, the schedule

---

[1] The court will grant Plaintiffs' Motion for Leave to File Surreply, ECF No. 32, as it finds that the EPA's reply brief presented new information to the court about the need to survey unregulated HAPs to which Plaintiffs were entitled to respond.  *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003).

originally presented to this court did not anticipate two rulemakings.  *See* Pls.' Notice Regarding Partial Rulemaking and Public Comment, ECF No. 33, at 2–3.

On September 26, 2024, the EPA filed a notice stating that the results for the second survey it sent to HWC facilities regarding unregulated HAPs would be delayed until September 29, 2024. Def.'s Notice of Action by EPA, ECF No. 34, at 1.  The court held a hearing on October 21, 2024, during which the Agency represented that the second survey results would be delayed even further due to issues with a third-party laboratory used by some sources to process emissions testing. *See* Hr'g Tr., ECF No. 41, at 5–6.  The EPA estimated that neither the delay in the survey responses nor the two-phased rulemaking would affect the final date of August 14, 2026, because it could exclude the four months originally budgeted for OMB review.  *Id.* at 20.  Plaintiff objected on the grounds that EPA's timeline kept evolving and insisted that a court-ordered deadline would prevent the EPA from eventually extending its deadline past August 2026.  *Id.* at 23–24.  The court required EPA to file a third declaration estimating the timeline for completing the HWC RTR.  *See* Order, ECF No. 35.

On November 4, 2024, EPA filed the requested declaration.  *See* Lassiter Decl. III.  It noted that the delays at the third-party laboratory resulted in multiple companies requesting extensions for emissions testing beyond the original return date of August 30, 2024.  *Id.* ¶ 9.  As of November 1, 2024, the EPA had received 83% of emissions testing results from seven of nine entities surveyed.  *Id.* ¶ 11.  The Agency anticipated receiving responses from one of the remaining entities by November 22, 2024.  *Id.*  It noted that the last remaining entity was currently non-operational, and therefore the EPA would only require emissions testing for the unregulated HAPs if and when that facility restarted operations.  *Id.* ¶ 12.  The EPA further stated that because it was missing data from only two of the six distinct HWC subcategories, it could proceed with the

rulemaking process for unregulated HAPs as to the other four subcategories in the interim. *Id.* ¶ 13.

Plaintiffs were unmoved. They responded that the latest declaration shows that the "second information collection survey is specific to unregulated pollutants and EPA has had the data it needs to begin working on already regulated pollutants for more than a year." Pls.' Notice Regarding Suppl. Briefing, ECF No. 37, at 1. In a fourth declaration, the EPA responded that data collection and compilation on regulated HAPs in fact had continued while the second survey regarding unregulated HAPs was ongoing. *See* Lassiter Decl. IV ¶ 4.

In the end, as of November 4, 2024, the EPA estimates that the time necessary to complete the remaining phases for the rulemaking is as follows:

| Remaining Phases | Completion or Estimated Completion Date |
|---|---|
| Phase III (one month): Supplemental Information Collection and Outreach to Stakeholders | November 22, 2024 |
| Phase IV (one month): Data Analyses and Modeling File Development | December 30, 2024 |
| Phase V (four months): Residual Risk Analysis and Technology Review | April 29, 2025 |
| Phase VI (six months): Development and Completion of Proposed Rule | October 24, 2025 |
| Phase VII (three months): Proposed Rule Publication and Comment Period | January 22, 2026 |
| Phase VIII (two months): Summarization of Comments, Development of Comment Responses and Analysis of Data | March 23, 2026 |
| Phase IX (five months): Development and Completion of Final Rule | August 14, 2026 |

Lassiter Decl. III ¶ 4. As this is the most updated timeline, the court considers the parties' arguments and declarations in light of these estimates.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). All parties agree that the EPA is derelict in its duty to complete the technology and residual risk reviews required of it under § 7412(d)(6) and § 7412(f)(2). Accordingly, the entry of summary judgment as to the issue of liability is appropriate. *See Johnson*, 444 F. Supp. 2d at 52. The only issue remaining is the appropriate remedy.

The CAA's citizen suit provision authorizes district courts to hear actions by "any person" seeking to compel EPA to perform "any act or duty . . . which is not discretionary." 42 U.S.C. § 7604(a)(2). The CAA therefore provides district courts "jurisdiction . . . to order the [EPA] to perform such act or duty" and "compel . . . agency action unreasonably delayed." *Id.* § 7604(a). A district court may use its equitable powers "to set enforceable deadlines both of an ultimate and an intermediate nature," which the agency must meet. *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974).

In determining the appropriate remedial timeline, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls [it] to do an impossibility." *Id.* at 713 (internal quotation marks omitted). But an equity court must scrutinize carefully claims by an agency that completion of its required task within a prescribed time is not feasible. *See id.* Accordingly, an agency bears a "heavy burden to demonstrate" that a proposed remedial timeline is "impossib[le]." *Alabama Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979). "That burden is especially heavy where the agency has failed to demonstrate any diligence what[so]ever in discharging its statutory duty to promulgate

regulations and has in fact ignored that duty for several years." *Johnson*, 444 F. Supp. 2d at 53 (internal quotation marks and citation omitted). A court may consider external constraints on an agency's ability to meet an expedited remedial timeline, including "budgetary commitments and manpower demands," which may be "beyond the agency's capacity" or which would "unduly jeopardize the implementation of other essential programs." *Train*, 510 F.2d at 712. But an agency may not simply argue that more time begets better regulations, or that it has "competing regulatory priorities" with which it must contend. *Johnson*, 444 F. Supp. 2d at 53–54.

## III.    DISCUSSION

Plaintiffs argue in the main that the EPA has not met its heavy burden of demonstrating that it is "impossible" to complete rulemaking before the Agency's proposed date of August 14, 2026. The court considers the EPA's justifications for its proposed timetable by evaluating its explanations of the work that needs to be done in each of the remaining phases of the RTR process.

### A.    Phase III

Of primary concern to Plaintiffs is the EPA's prolonged Phase III supplemental information collection phase, which required the agency to issue more comprehensive surveys to HWC facilities because of its duty to issue new emissions standards for unregulated HAPs. Plaintiffs argue that EPA's "obligation to set new limits for unregulated pollutants" did not support "putting off its review of existing limits for already-regulated pollutants." Pls.' Surreply at 2 (emphasis omitted).

The court is satisfied that up until November 22, 2024, the Agency has been acting diligently to collect the raw data needed to complete the RTR. Plaintiffs' attempts to uncouple the EPA's rulemaking responsibilities for previously regulated HAPs from those for unregulated HAPs are unconvincing and would require the EPA to act contrary to law. The Agency *must* develop

initial technology-based standards for unregulated HAPs emitted by an HWC source when conducting the periodic technology review under § 7412(d)(6). *See LEAN*, 955 F.3d at 1096. This is the exact scenario that confronted the EPA during this ongoing rulemaking. According to Lassiter, the EPA's preliminary information collection during Phase II revealed that some HWC sources potentially emitted unregulated HAPs. *See* Lassiter Decl. II ¶ 4; Lassiter Decl. III ¶ 5. As a result, the EPA issued a first survey to HWC facilities to identify unregulated HAPs in their emissions, in addition to requesting information about regulated HAPs. Lassiter Decl. III ¶ 6; Lassiter Decl. IV ¶ 5. The responses to this survey indicated that the HWC sources did in fact emit certain unregulated HAPs, which prompted the EPA to issue a "second survey" for emissions testing data for these pollutants. Lassiter Decl. III ¶ 8. Due to delays from one of only three laboratories that can process this sort of emissions testing, the EPA had to extend the return date for the results until November 22, 2024. *Id.* ¶¶ 9–10.

As case law makes clear, the EPA must not only promulgate missing emissions standards uncovered during its periodic technology review, but it also must base those standards on actual performance testing data from existing sources pursuant to § 7412(d)(3). The D.C. Circuit in *LEAN* found that "the Act is best read to require any underinclusive emission standards be 'revised' as 'necessary' to comply with section [7412](d)(2)–(3) during the eight-yearly review set by section [7412](d)(6)." *LEAN*, 955 F.3d at 1099. And the D.C. Circuit repeatedly has said that emissions floors established pursuant to § 7412(d)(3) must "reflect what the best performers *actually achieve*" by using MACT. *Cement Kiln*, 255 F.3d at 861 (emphasis added); *see also Ne. Maryland Waste Disposal Auth. v. EPA*, 358 F.3d 936, 955 (D.C. Cir. 2004); *Sierra Club v. EPA*, 479 F.3d 875, 880 (D.C. Cir. 2007). Whereas the EPA requires HWC sources to conduct performance testing for regulated HAP emissions on regular intervals, *see* 40 C.F.R.

§ 63.1207(b)(3), (d), (m), sources are not required to do so for unregulated HAPs.  The Agency therefore did not have the requisite data to establish emissions floors as to unregulated HAPs for new or existing HWC sources—the collection of this data required additional time and testing. *See* 42 U.S.C. § 7412(d)(3)(A)–(B) (requiring emissions standards for existing sources to be based on the best performing sources for which the EPA has emissions information); *see also id.* § 7412(d)(3) (requiring emissions standards for new sources to be at least as stringent as the "emission control that is achieved in practice by the best controlled similar source").

The EPA's requests for supplemental information covered both the identification of unregulated HAPs and the performance testing data needed to set the initial emissions standards. These actions are compelled by the CAA and controlling precedent.  For EPA to proceed as Plaintiffs suggest would be to work contrary to congressional intent—"Congress cannot have intended to require that the Agency, the regulated community, and interested members of the public engage piecemeal with rulemakings amending the same emission standard under section [7412](d)(2)–(3) and, separately, under section [7412](d)(6)."  *LEAN*, 955 F.3d at 1099.  And though it is unfortunate that the delays from a third-party laboratory extended the time frame for supplemental information collection, penalizing the EPA for something it could not control would be unfair.

### B.    Phases IV–IX

All that said, the court agrees with Plaintiffs that the EPA has not demonstrated that it is "impossible" to complete the HWC rulemaking before August 14, 2026.  According to the EPA, "August 14, 2026, is the earliest date by which the [Sector Policies and Programs Division] can practicably propose and finalize the RTR for hazardous waste combustors."  Def.'s Summ. J. Mem.

17

at 9.[2]  This date apparently accounts for (1) the maximum number of tasks that may be performed concurrently and (2) the shortest time frame in which the various tasks in each phase can be performed.  *Id.* at 10–11.  This court is not convinced on either count—the question here is one of impossibility, not practicability.

As a threshold matter, the EPA argues that it cannot complete the rulemaking prior to August 14, 2026, because all Sector Policies and Programs Division personnel are fully committed under the proposed schedule, as the Agency is simultaneously working on other projects, many on court-ordered deadlines.  *See* Def.'s Summ. J. Mem. at 11.  These include consent decrees requiring the EPA to review and revise regulations for 31 source categories under § 7412 and 11 other source categories under other portions of the CAA.  *Id.*; *see also* Lassiter Decl. I ¶ 14.  Additionally, the EPA "is working to fulfill existing statutory obligations for more than 20 additional source categories under" § 7412 for which it "expects to have deadlines established in consent decrees or judgments resolving other pending or imminent citizen suits."  Def.'s Summ. J. Mem. at 11–12.  Mind you, the EPA puts no dates or specific resource commitments to these obligations; nor does it identify in its more recent filings how many remain outstanding.  Though a court may consider the "budgetary commitments and manpower demands" placed on the EPA, *see Train*, 510 F.2d at 712, the relevant standard here is one of impossibility, and the EPA has not established that it would be impossible for it to finish the overdue RTR for HWCs at a quicker pace in parallel with its other responsibilities.  Indeed, "shifting resources in response to statutory requirements and court orders is commonplace for [the] EPA."  *Johnson*, 444 F. Supp. 2d at 54 (internal quotation marks and

---

[2] The court notes that the EPA asserted that August 14, 2026, was the earliest possible completion date when it included four extra months for OMB review.  *See* Lassiter Decl. I ¶¶ 24(f), 27(e).  Although the EPA later excluded the time for OMB review from its estimated timeline, *see* Hr'g Tr., ECF No. 41, at 20, it strikes the court as odd to assert impossibility while including a substantial chunk of time for OMB review.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1991) (finding that an OMB review requirement is no excuse to miss a statutory deadline).

citation omitted).  Further, the EPA's nonspecific expectation that it will "have deadlines established in consent decrees" is unconvincing—speculation about potential delays is no reason for the EPA to prolong the overdue rulemaking in this case.

With this threshold argument put aside, the court now turns to the estimated completion times for the remaining substantive phases.  Beginning with Phase IV, the EPA anticipates that it will take until December 30, 2024, to complete the necessary data analyses and modeling file development.  *See* Lassiter Decl. III ¶ 4.  The EPA represents that it thus far has spent roughly 800 hours extracting data from PDFs collected in Phase II into a usable format, and it is expected to finish that process in November 2024 to facilitate completion of Phase IV in December 2024. *Id.* ¶ 14; Lassiter Decl. IV ¶ 9.  The Agency's technological shortcomings motivated a partial rulemaking on the topic.  *See* Hr'g Tr., ECF No. 41, at 4.  But the EPA represented to this court that it had completed Phase II's preliminary information collection by July 2023, and the Agency has not provided sufficient information for the court to conclude that it has acted with the "utmost diligence" in extracting and processing the relevant data it received.  *See* Lassiter Decl. I ¶ 20; *Johnson*, 444 F. Supp. 2d at 53 ("When an agency has failed to meet a mandatory statutory deadline, it is insufficient for the agency to demonstrate only that it has proceeded in good faith; it also must demonstrate that it has exercised utmost diligence in its efforts to comply with the statute." (internal quotation marks omitted)).  The Agency's lack of updated technology cannot be the reason for an inflated schedule to the detriment of the public.

As for Phase V, the EPA estimates that it needs four months to complete its substantive residual risk and technology reviews.  But the Agency has not shown that part of this phase cannot be done concurrently with other tasks.  There is no requirement that the EPA perform a residual risk review for unregulated HAPs; the delay in receiving emissions testing data thus should not

affect this portion of the rulemaking. This makes sense: the Agency cannot review the risk remaining from any new emissions limits for unregulated HAPs until after the new limits are put in force. *See* 42 U.S.C. § 7412(f)(2). The EPA has not shown that it cannot perform the required residual risk review for regulated HAPs while it awaits outstanding emission testing results and data analyses for unregulated HAPs. The court thus deems two months to be a reasonable timeline for Phase V.

As for the remaining tasks in Phases VI–IX, which the court considers together, the EPA does not provide the court with the information needed to determine that it can satisfy the "heavy burden to demonstrate . . . impossibility" in completing the RTR in less time than the 16 months estimated. *Costle*, 636 F.2d at 359. The EPA asserts that the time frames for certain tasks "could not be shortened because they are outside of EPA's control" and because they are "mandated by statute." Def.'s Summ. J. Mem. at 11. But Lassiter identifies only a few time frames truly outside of the EPA's control or mandated by procedure or statute. *See* Lassiter Decl. I ¶¶ 24–25, 27. Those are (1) internal procedures mandating a 15-business day period for workgroup review during development of the proposed and final rules (21 calendar days), (2) publication of the proposed rule in the Federal Register, which is controlled by the National Archives and Records Administration, and (3) the CAA's statutory requirement that the EPA provide an opportunity for a public hearing and that the public comment period remain open for 30 days following a public hearing on the rule. *Id.*; *see also* 42 U.S.C. § 7607(d)(5). The EPA's time estimates for these tasks account for, at most, four of the 16 months. The other projected time periods are estimates of how long tasks *may* take to be completed satisfactorily. These estimates do not satisfy the Agency's heavy burden. *See New York v. Gorsuch*, 554 F. Supp. 1060, 1065 (S.D.N.Y. 1983) ("While the Administrator should be commended for striving to develop the fullest possible statistical basis for

any regulations [he] promulgates, the quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly.").

The Agency also projects that the last three phases alone will take at least 10 months to complete.  *See* Lassiter Decl. III. ¶ 4.  Plaintiffs point this court to previous source categories for which EPA has moved from proposed to final rulemaking in as little as three months.[3]  And courts have found that "it is feasible to complete phases seven through nine for [two] source categories within five to seven months."  *McCarthy*, 2016 WL 1055120, at *6 (citing multiple air quality rules which took between five to seven months from proposed rule publication to final rule publication).  The court therefore thinks the claimed 10 months needed to complete the last three phases is not reasonable.

Given all these considerations then, the court deems 10 months to be a reasonable timeline for the last *four* phases (Phases VI–IX).  This timeline takes into account five months to develop the proposed rule and an additional five months to move from the proposed rule to the final rule.

The EPA maintains that the HWC source category is "unusually complicated and time-consuming" because HWCs "vary widely in design and in the composition of the waste burned," and thus comparison to other rulemakings is not appropriate. Def.'s Summ. J. Mem. at 9, 9 n.1. At bottom, however, EPA must complete only *one* RTR for *one* source category, and has collected

---

[3] *Compare Nat'l Emission Standards for Hazardous Air Pollutants for Area Sources: Polyvinyl Chloride and Copolymers Prod., Primary Copper Smelting, Secondary Copper Smelting, and Primary Nonferrous Metals—Zinc, Cadmium, and Beryllium*, 71 Fed. Reg. 59,302 (Oct. 6, 2006) (proposed rule for four area source categories), *with Nat'l Emission Standards for Hazardous Air Pollutants for Area Sources: Polyvinyl Chloride and Copolymers Prod., Primary Copper Smelting, Secondary Copper Smelting, and Primary Nonferrous Metals: Zinc, Cadmium, and Beryllium*, 72 Fed. Reg. 2,930 (Jan. 23, 2007) (final rule); *compare Nat'l Emission Standards for Hazardous Air Pollutants for Area Sources: Acrylic and Modacrylic Fibers Prod., Carbon Black Prod., Chemical Mfg.: Chromium Compounds, Flexible Polyurethane Foam Prod. and Fabrication, Lead Acid Battery Mfg., and Wood Preserving*, 72 Fed. Reg. 16,636 (Apr. 24, 2007) (proposed rule for seven additional source categories), *with Nat'l Emission Standards for Hazardous Air Pollutants for Area Sources: Acrylic and Modacrylic Fibers Prod., Carbon Black Prod., Chemical Mfg.: Chromium Compounds, Flexible Polyurethane Foam Prod. and Fabrication, Lead Acid Battery Mfg., and Wood Preserving* 72 Fed. Reg. 38,864 (July 16, 2007) (final rule).

nearly all, if not all, of the data needed for it to finish the rulemaking as expeditiously as possible. It has been over two years since the EPA began this RTR—courts have ordered the Agency to issue final rules for multiple source categories in the time that it has taken for this single-source RTR to proceed through its preliminary stages. *See Blue Ridge*, 261 F. Supp. 3d at 61 (ordering the EPA to complete seven overdue RTRs then in Phase I and II in just over 21 months of the court's order, and six overdue RTRs within 18 months thereafter); *McCarthy*, 2016 WL 1055120, at *7 (ordering the EPA to complete two overdue RTRs by October 1, 2017 when the court issued its order on March 15, 2016); *cf.* Order, ECF No. 50, *Cal. Cmtys. Against Toxics v. Pruitt*, No. 15-cv-512 (TSC) (Mar. 13, 2017) (ordering the EPA to complete 20 overdue RTRs within three years). Accordingly, assuming Phase IV is completed by December 30, 2024, as the Agency projects, the court deems an ultimate deadline of just over a year—two months for Phase V and 10 months for Phases VI–IX—to be reasonable given the EPA's progress on this single rulemaking so far.

In sum, this RTR for a single source category is nearly a decade overdue and has already been under advisement before the EPA for two years. The court finds that EPA has not established that it needs until August 14, 2026, to finish the mandatory rulemaking. In the exercise of its equitable discretion, the court orders that the RTR be completed by December 31, 2025. *See Cal. Cmtys.*, 241 F. Supp. 3d at 207 (cautioning against ordering a deadline that is "simply too compressed . . . to afford any reasonable possibility of compliance" (quoting *Johnson*, 444 F. Supp. 2d at 58)). The court declines to impose an interim deadline for a proposed rule. The court will defer to the EPA on how to structure the remainder of its rulemaking process.

## IV.    CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Plaintiffs' Motion for Summary Judgment, ECF No. 24, denies Defendant's Motion for Summary Judgment, ECF No.

26, and grants Plaintiffs' Motion for Leave to File Surreply, ECF No. 32.  A separate final, appealable order accompanies this opinion.

Dated: December 12, 2024

Amit P. Mehta
United States District Court Judge